### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PAMELA WILLIAMS**
**o/b/o C.C., a minor child,**

Plaintiff,

-vs-                                                                    Case No.  6:05-cv-1298-Orl-19GJK

**COMMISSIONER OF SOCIAL SECURITY,**

Defendant.

_____

### REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Pamela Williams ("Williams") on behalf of her minor daughter, C.C., appeals to the district court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") benefits.  Doc. No. 1.

## I.     FACTUAL BACKGROUND

C.C. was born on May 10, 1991.  R. 55.  According to Williams, C.C. suffers from behavioral problems, including problems controlling her temper, and learning disabilities all of which manifested soon after she was born. R. 91.

**School Records**

The record reveals that C.C. has continually struggled in school both academically and behaviorally.  R. 115-16, 128-131, 143-54, 166-84, 233-39, 246-54, 263, 279, 284-85, 306.  On April 2, 2004, roughly three months before the hearing, C.C.'s Individual Education Plan for the

seventh grade stated that she was functioning on a fourth grade academic level.  R. 263. Additionally, C.C.'s standardized test scores from the third grade through the sixth grade rank in the lowest level state wide.  R. 115-16, 121-31, 233-36, 252-54.

**Medical Records**

Beginning in 1997, the record reflects that C.C. has been treated for behavioral problems by numerous medical professionals.

**Dr. M. Siegfried**

On August 26, 1997, when C.C. was in the first grade, she was referred to Dr. Siegfried, a Certified School Pschologist "for individual evaluation in order to obtain a measure of her intellectual abilities, to acquire more information regarding her poor academic progress and to determine the need and eligibility for further educational alternatives."  R. 161.  Dr. Sigfried administered the following tests: the Wechsler Intelligence Scale for Children – Third Edition ("WISC-III"); the Bender Visual-Motor Gestalt Test ("Bender"); the Skills Cluster subtests of the Woodcock-Johnson Tests of Achievement-Revised ("WJ-R:ACH"); and the Short Term Memory and Visual Processing Cluster subtests of the Woodcock-Johnson Test of Cognitive Ability – Revised ("WJ-R:COG").  R. 162.

> On the WIS-III [C.C.] obtained a Verbal IQ of 80, Performance IQ of 93 and Full Scale IQ of 84.  These scores fall within the Low Average (Slow Learner) to Average ranges of functioning.
> . . .
>
> Visual Motor maturation was assessed with the Bender.  [C.C.] made nine perceptual motor errors on the Bender which gave her a developmental age range of 5-9 to 5-11 years.  Her performance at chronological age range correspond to a standard score of 98 using the Koppitz Developmental Scoring System.  The most significant aspect of the child's Bender was the presence of number of

2

behavioral indicators.   Present were large size of figures, increasing size of figures, careless overwork and expansion.  These behavioral indicators are associated with impulsivity, low frustration tolerance and possible acting out tendencies.

. . .

On the Skills cluster of the [WJ-R:ACH] . . . [C.C.'s] developmental age range . . . was 5-2 to 5-11.  Her weakest area was letter-word identification.   She is still having difficulty identifying upper and lower case letters.  She can print her first name but her lower case "n" looks like an "r" and she has to spell her name out loud to recall the letter sequence.  When asked to print her last name she correctly printed the beginning "C" and last two "t's".  [C.C.]'s overall performance on the Skills Cluster falls in line with her Low Average (Slow Learner) cognitive skills.

. . .

The [WJ-R:COG] reflects [that C.C. has] a significant deficit in Visual Processing.  The Visual Processing cluster measures "broad visualization" which requires fluent thinking with stimuli that are visual in the mind's eye.  The types of abilities measured on this cluster include recognizing rotations and reversals of figures, finding hidden figures, identifying incomplete or distorted figures, and comprehending spatial configurations.

R. 162-163.  "[C.C.] is the type of student who will need extra drill and over review of material since she can be expected to learn at a slower rate and retain less information than the average student," and, therefore Dr. Siegfried recommended that [C.C.] be considered for special education services.  R. 164. [1]

**Dr. Paul Jacobson**

On or about September 13, 2001, C.C. was admitted to the Devereux Treatment Network Outpatient Program in Deland, Florida.  R. 202, 208.  On October 22, 2001, C.C. was initially interviewed by Dr. Paul Jacobson.  R. 202-204.  C.C. was ten years old and in the fourth grade at

---

[1] As evidenced by her fourth and fifth grade teachers' reports and Individual Education Plans, C.C. was placed in special education classes.  R. 166-191.

3

the time of the initial interview.   R. 202.   Dr. Jacobson found C.C. demonstrated "severe disruptive behavior problems primarily at home."  R. 202.  "Of significance is that [the problems are] primarily only in the presence of the primary support system.   [The problems have] not occurred during the school surroundings or environments."   R. 202.   Dr. Jacobson found "no major medical problems" with C.C.  R. 203.

Regarding C.C.'s mental status examination, Dr. Jacobson found C.C. to be "alert, oriented, and minimally cooperative."  Doc. 203.

> At no time was she aggressive or acting out.   There was no belligerence, hostility, or rage.   Her mood appeared to be stable and euthymic at this time.   She was not appearing anxious or depressed.  No evidence of any self-destructive behavior.

R. 203.   Dr. Jacobson's diagnostic impressions were that C.C. had Oppositional Defiance Disorder with passive aggressive personality features.  R. 203.  He found no physical condition or illness contributing to the psychiatric problem and the severity of the psychological stressors to be moderate to severe including her primary support system, problems with authority, and problems with living.  R. 204.  Dr. Jacobson recommended that no psychotropic medications be administered at that time, discussed Oppositional-Defiant disorder with Williams and C.C.'s step-father, and developed a treatment plan for C.C.  R. 204.

On November 19, 2001, Dr. Jacobson conducted a follow up interview and exam with C.C. and Williams.  R. 200.  According to Williams, C.C.'s home behavior was "a little better." R. 200.  However, Williams reported to Dr. Jacobson that C.C. continues be argumentative and does not listen to commands.   R. 200.   In the interview, Dr. Jacobson indicated that C.C. appeared well groomed, "quiet and cooperative, maintaining good eye contact."  R. 200.

> She is friendly in her demeanor.  She is not aggressive or
> intimating.  She has no belligerence, hostility, or rage.  There is no
> psychomotor retardation and no agitation.  Her insight is adequate.
> Her judgment is appropriate at this time, although in the past it has
> been impulsive.  She has a tendency to not listen.  There is no
> evidence of any thought disorder.

R. 200.  Dr. Jacobson continued to recommend that no medication be administered, but

suggested consistent discipline.  R. 200.

On December 19, 2001, Dr. Jacobson conducted another follow up interview and exam

with C.C. and both parents.  He reported that C.C. continued to have behavioral problems and

"some aggressive behavior."  R. 198.

> The client was initially distressed.  She was tearful.  She
> apparently had missed a school afternoon activity that she wanted
> to participate in.  Later, towards the end of the interview, she was
> able to regain composure.  She does appear to be somewhat
> irritable and angry as well.  She was frowning, for the most party,
> throughout the interview today.  She was not exhibiting any self-
> destructive behavior, although when she was upset, she was
> twisting at her eye.  But she did redirect when asked to put her
> hands on her lap.  Cognitively, she was intact.  Insight is adequate.
> Judgment is appropriate at this time, although she typically acts
> stubborn and defiant, consistent with her Oppositional-Defiant
> Disorder.

R. 198.  Dr. Jacobson recommended adding Depakote 250mg as part of the overall treatment

process "to take the edge off the aggressive impulses."  R. 198.

On January 16, 2002, Dr. Jacobson conducted his last interview and exam with C.C.  R.

191.   According to Dr. Jacobson, C.C.'s parents indicated that the Depakote was working and

that C.C.'s aggressive temper and acting out behavior had diminished considerably.  R. 191.

C.C.'s report card also improved and no disciplinary referrals had been issued at school.  R. 191.

Dr. Jacobson reported that C.C. was alert, under control, and there were no behavioral

abnormalities, agitation, or hyperactivity in her presentation.  R. 191. He recommended that C.C. remain taking the Depakote and scheduled her next visit.  However, the record does not indicate whether Dr. Jacobson ever met again with C.C.  R. 191.

**Medical Evaluations – Dr. Borkosky**

On October 23, 2002, C.C. was referred by the Office of Disability Determination ("ODD") for a consultative evaluation concerning her application for disability benefits.  R. 212. The "primary allegations" concerning  C.C. were that she had "[Attention Deficit Disorder], behavior problems, Specific Learning Disability, Mental Retardation, depression, and psychosis." R. 212.  Dr. Bruce Borkosky attempted to conduct an interview with C.C. and made the following observations.

> Her behavior when with her parent was that she screamed and cried very loudly in the waiting room.  She was given options of either not crying and talking to this examiner, or waiting outside, and she chose to come into the exam room.  She whimpered for a awhile in the exam room, and pounded her head with her fist (occasionally, and not very hard).  She stated that the reason she was crying was that she had wanted to go to 'camp', and after school, and that coming to the office was preventing her from getting what she wanted.  She appeared to stop crying, after given encouragement from this examiner.
> 
> . . .
> 
> MENTAL STATUS     Attention and concentration skills seemed commensurate with age.  She was oriented for person.  She reported no significant fears.  Thought processes were egocentric. Content of thought was egocentric.  There were no indications of delusional thinking, compulsions, obsessive thoughts, or phobias. Auditory, visual, and olfactory hallucinations were denied. Immediate and recent memory did not appear impaired. Intellectual ability was estimated as being in the borderline range. Fund of information was unknown.  Abstracting ability was fair. Computational skills were unknown.  Insight is poor.  Judgment is fair.  The possibility of a suicide attempt appears to be low.

6

> Ability to delay gratification is below average and her ability to
> tolerate frustration is below average.

R. 213.  Dr. Borkosky attempted to administer "three different subtests from the WISC III and

WIAT," but C.C. did not fully participate in the tests.  R. 213.  Dr. Borkosky's impressions and

recommendations were inconclusive.  R. 213.  "Her demeanor was irritable, apathetic, immature,

uncooperative, and oppositional.  The exam is not valid."  R. 213.

### Medical Evaluations – Dr. Graham

On March 7, 2003, C.C. was evaluated by Dr. Malcolm Graham, a clinical psychologist,

concerning her SSI application.  R. 222.  Dr. Graham reported that C.C. was taking Depakote at

500mg, but at an unknown frequency.  R. 223.  Dr. Graham administered the General Intellectual

Evaluation ("WISC-III) test and the Woodcock-Johnson Test of Achievement – III.  R. 222.

C.C. scores were as follows:  Verbal Scale IQ 66, Performance Scale IQ 58, and Full Scale IQ

59.  R. 224.  The scores reflect a "mild range of intellectual ability," but Dr. Graham concluded

that she was actually in the "borderline" range of intellectual ability.  R. 224-226.

> [C.C.] is presently functioning, as measured by her present IQ test,
> in the mild range of mental retardation.  However, she had a great
> deal of intra-test scatter, appeared to be very poorly motivated, and
> her actual functioning is felt to be in the borderline range.  Her
> performance on the Woodcock-Johnson Test of Achievement-II is
> also supportive of the very strong possibility that she is functioning
> in the borderline range.   She probably does have a reading
> disability.

R. 226.  Dr. Graham also noted that C.C. was approximately three years behind in reading, two

years behind in written languages, and a year and a half behind in math.  R. 225.

On March 21, 2003, Dr. James B. LeVasseur, a clinical psychologist and the State of

Florida's Agency Consultant, filled out the Childhood Disability Evaluation Form regarding

7

C.C.'s disability claim.  R. 227-232.  It appears that this form was completed as a result of Dr. Graham's evaluation of C.C.   Dr. LeVasseur concluded that C.C.'s impairments were severe, but do not meet, medically equal, or functionally equal the listings from 20 C.F.R. § 404. Regarding functional equivalence, Dr. LeVasseur concluded that C.C. had a less than marked limitation in the domain of acquiring and using information and no limitations in all other domains.  R. 229-230.

**Medical Evaluations – Dr. Hoffman.**

On July 22, 2003, C.C. was evaluated by Dr. Richard Greer, MD, at the Halifax Medical Center.  Dr. Greer indicated that C.C. was acting defiant and disrespectful and had recently been suspended from school.  R. 307.  Williams and C.C.'s "case worker" were present at the evaluation and reported that C.C. lies, manipulates and is "out of control."  R. 307.  Dr. Greer recommended Partial Hospitalization.   On July 30, 2003, C.C. was admitted to the Partial Hospitalization Program at Halifax Behavioral Center and treated by Dr. Donald L. Hoffman, Jr., MD.  R. 306.   On August 6, 2003, C.C. was evaluated by Dr. Hoffman regarding her behavior problems.  R. 309.  Dr. Hoffman indicated that Dr. Greer had prescribed Concerta 36mg and Depakote extended release 500mg for C.C., but Williams had discontinued the Depakote due to insurance problems.  R. 309.[2]  Dr. Hoffman reported that C.C. had previously been diagnosed with Attention Deficit Hyperactivity Disorder and Oppositional Defiant Disorder, and that Williams stated C.C. continued to be oppositional defiant and aggressive without the Depakote. R. 310.   According to Williams, C.C. had "ongoing anhedonia,[3] decreasing interests, and

---

[2] The record does not indicate when Williams discontinued the Depakote.

complaints of constant boredom and dissatisfaction with life in general and not enjoying anything." R. 310.   Dr. Hoffman noted that C.C. showed no signs of hyperactivity, she was pleasant and cooperative.  R. 311.   Dr. Hoffman assessed C.C. as having Attention Deficit Hyperactivity Disorder, combined type and Depressive Disorder, not otherwise specified with moderate symptoms.  R. 312.   He recommended that she continue the Partial Hospitalization Program and added Wellbutrin SR 100 mg to her medication.  R. 312.

### Medical Evaluations – Dr. Dow

On October 16, 2003, it appears that C.C. began an evaluation by Dr. Thomas Dow.  R. 321, 314-320.[4]   C.C. was diagnosed as having Attention Deficit Hyperactivity Disorder combined with Depressive Disorder.  R. 321.  On December 29, 2003, C.C. was evaluated again with the same resulting diagnosis.  R. 320.  The records reflect that C.C. was taking Wellbutrin SR 100mg and Concerta 36mg. R. 320.  On March 31, 2004, it appears that C.C. was evaluated again by Dr. Dow after a disruption at school and another medication was added to C.C.'s regimen.   R. 319.   On that same day, Dr. Dow completed an untitled form related to the application for disability benefits.  R. 314-317.   Dr. Dow listed C.C.'s medically determinable impairments as Bipolar Disorder, Attention Deficit Hyperactivity Disorder, combined type.  R. 314.    When asked to describe how the impairments affected the child's development and performance in certain domains, Dr. Dow listed the following:

> (1) Cognitive Development/Function – Marked;
> (2) Communicative Development/Function – Less than moderate;
> (3) Motor Development/Function – Extreme;

---

[3] Total loss of pleasure in things that normally provide pleasure.

[4] C.C. was evaluated on October 16, 2003, December 29, 2003, and on March 31, 2004.

>    (4) Social Development/Function – Marked; and
>    (5) Personal/Behavioral Development/Function – Marked.

R. 314-316.[5]   The form requested that Dr. Dow "[s]ummarize the evidence that supports your descriptions of functional limitation."   R. 314.   However, that portion of the form was not completed by Dr. Dow.   R. 317.

## II.   **PROCEDURAL HISTORY**

On or about July 23, 2002, Williams applied for SSI benefits on behalf of her minor daughter.   R. 55-58.[6]   The application for disability states that C.C.'s disability began on or soon after May 10, 1991, her date of birth.   R. 55.   Williams' application was initially denied, and on reconsideration, Williams requested a hearing.   R. 46-54.

On July 12, 2004, a hearing was held before Administrative Law Judge Chester G. Senf (the "ALJ"). R. 322-342.   At the time of the hearing, C.C. was thirteen years old and was about to enter the seventh grade in special educations classes.   R. 327.   Testimony was taken from C.C., Williams, and Felton Williams, C.C.'s step-father.   R. 326-330, 330-338, 338-341.   C.C. testified that in the past year she had received thirteen or fourteen referrals in school for fighting and other inappropriate behavior. R. 327.   C.C. stated that she had been suspended for two days the previous year.   R. 327-328.   C.C. also reported that she had no friends, does not want to be "bothered" by her brothers and sisters, and that she gets in fights because people "mess with me."   R. 327-330.   Williams testified that she believed C.C. was disabled for the following

---

[5] There is another domain of functionality which Dr. Dow noted as an extreme limitation, but the top of the page is cut off and the domain title is eligible. R. 316.   However, from the transcript of the hearing it appears Dr. Dow assessed C.C. as having an extreme limitation in concentration.   R. 325-26.

[6] Williams previously filed an application for SSI benefits on or about September 2001, but the application was denied without further appeal.   R. 64-67.

reasons:

> She in ESE.  And she have problems at home, like if I tell her to do
> something, she won't – like she   don't hear me or she go to
> hollering.  She'll hit her head on the floor, on the wall, scratch
> herself.  She make marks on herself and you know, always fighting
> the kids.  Like if I tell her to do something, she going to jump on
> one of the other kids or something like that.

R. 331.  When asked about her behavior at school, Williams testified that she also has problems

at school.  R. 332.

> She talks back to the teachers.  And one day the principal had to
> call, the ESE principal had to call me because [C.C.] wouldn't do
> what the teacher said do.  So she called the principals, and the
> principal told [C.C.] to come to his office.  And she wouldn't
> come.  She wouldn't go.  So he had to go to the classroom and get
> her.  And I had to go out to the schoolhouse where she was.

R. 332.  Williams testified that she had been summoned to the school twice in the past year due

to C.C.'s behavior.  R. 333.

Williams stated that she originally took C.C. for psychiatric care due to C.C. repeatedly

"bumping her head and stuff on the floor."  R. 334.  According to Williams, C.C. had been under

psychiatric care for a year or two.  R. 334.  Williams testified that C.C. had been bumping her

head on the floor since she was one year-old and that C.C. had been hospitalized at the Halifax

Child and Adolescent Psychiatric Program due to her "tantrum fits" during the previous summer.

R. 336-337.   Williams also stated that since C.C. had been hospitalized, treated by Dr. Dow, and

given medication that she was behaving better.  R. 336.

Felton Williams testified that C.C. has always had behavior and attention problems.  R.

339.  "You know, she will – you won't let her do nothing, she'll get on the floor and beat her

head against the wall and everything."  R. 339.   Mr. Williams testified that C.C. had been under

a doctor's care for three to four years, but, in his opinion, it had not helped.  R. 340.  Mr.

Williams testified that C.C. was very aggressive and he was afraid that she would hurt someone.

R. 341.

Counsel for C.C. argued at the hearing that the report given by Dr. Dow indicated that

C.C.'s impairments caused "marked" limitations on her functioning in three areas, and an

"extreme" limitation in two.  R. 341.  Thus, according to counsel, C.C. is entitled to SSI benefits

under the Social Security Act.

On December 1, 2004, the ALJ issued an unfavorable written decision denying Williams'

application.  R. 13-24.  Specifically, the ALJ made the following findings:

1. [C.C.] has never engaged in substantial gainful activity.
2. [C.C.] has the following medically determinable sever impairments: attention deficit and hyperactivity disorder, depressive disorder and learning disorder in reading.  These impairments have more than a minimal effect on [C.C.'s] functioning [and are therefore "severe" impairments as defined in regulations].
3. The testimony was not fully credible and did not support a finding of disability.
4. [C.C.] does not have an impairment or combination of impairments that meets or medically equals the criteria of any impairments listed in Appendix 1, Subpart P, 20 CFR Part 404.
5. [C.C.] does not have an impairment or combination of impairments that functionally equals the criteria of any listed impairment.
6. [C.C.'s] severe impairments do not result in marked and severe functional limitations that would be expected to last twelve months or result in death.
7. [C.C.] has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

R. 20, 23 (bracketed text in paragraph 2 found at R. 20).

12

On January 5, 2005, Williams sought review of the ALJ's decisions from the Appeals Council. R. 11-2. The Appeals Counsel denied Williams' request for review, thereby making the ALJ's decision the final decision of the Commissioner. R. 5-7; 20 C.F.R. §§ 416.1455, 416.1481, 422.210(a) (2008). On September 6, 2005, Williams sought review of the final decision of the Commissioner in the United States District Court. Doc. No. 1. On January 9, 2008, Williams filed a memorandum in support of her appeal. Doc. No. 49. On March 6, 2008, the Commissioner filed a memorandum in support of his decision that C.C. is not disabled. Doc. No. 50. The appeal is ripe for a determination.

## III.   **THE PARTIES' POSITIONS**

Williams assigns three errors to the ALJ. First, Williams claims that the ALJ's determination that C.C.'s functional limitations in the domains of acquiring and using information and interacting and relating to others were "less than marked" was not supported by substantial evidence. Second, Williams claims that the ALJ erred when he failed to make any findings or list any reasons for discrediting the testimony of C.C. Finally, Williams claims the ALJ erred by discrediting the testimony of Pamela and Felton Williams for reasons not supported by substantial evidence. Williams' claims that each of the ALJ's errors warrant remand under sentence four of Section 405(g). On remand, Williams seeks instructions for an award of benefits or, alternatively, instructions for the Commissioner to reassess C.C.'s functional limitations, to make a credibility finding regarding C.C.'s testimony, to reassess the credibility of Williams and Felton Williams, and to issue a new decision concerning disability that is supported by substantial evidence and comports with law.

IV.     **LEGAL STANDARDS**

A.      **THE ALJ'S THREE-STEP DISABILITY ANALYSIS**

For a finding of disability for a child claimant, the ALJ must determine that the child has a medically determinable impairment or combination of impairments that results in marked or extreme functional limitations and has lasted or can be expected to last for a continuous period of not less than twelve months or that can be expected to result in death.   42 U.S.C. § 1382c(a)(3)(C)(i) (2004); 20 C.F.R. § 416.924.   Under the authority of the Social Security Act (the "Act"), the Social Security Administration has established a three-step sequential evaluation process for determining whether an individual under the age of eighteen is disabled.   *See* 20 C.F.R. § 416.924.   The steps are followed in order.   If it is determined that the child claimant is or is not disabled at any step of the evaluation process, the evaluation will not go on to the next step.

At step one, the ALJ must determine whether the child claimant is engaged in substantial gainful activity.   20 C.F.R. §§ 416.924(a)-(b).   Substantial gainful activity ("SGA") is defined as work activity that is both substantial and gainful.   "Substantial work activity" is work activity that involves performing significant physical or mental activities.   20 C.F.R. § 416.972(a). "Gainful work activity" is work that is usually performed for pay or profit, whether or not a profit is realized.   20 C.F.R. § 416.972(b).   Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he or she has demonstrated the ability to engage in SGA.   20 C.F.R. §§ 416.974-975.   If the child claimant is engaged in SGA, the ALJ will determine that the child is not disabled.   20 C.F.R. §§ 416.924(a)-(b).   If the child is not engaged in SGA, then the analysis proceeds to the

14

second step.

At step two, the ALJ will determine whether the child claimant's physical or mental impairments or a combination of impairments is severe.  20 C.F.R. § 416.924(a).  When the ALJ determines whether a child claimant has a severe impairment, he or she will compare the child's functioning to that of children of the same age who do not have impairments.  20 C.F.R. § 416.924b(a)(1).  If the ALJ determines that the child claimant's impairment(s) "is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," the ALJ will find that the child does not have a severe impairment and, thus, is not disabled.  20 C.F.R. § 416.924(c).  An ALJ will consider an impairment or combination of impairments "severe" if it is medically determinable and if it causes more than minimal functional limitations.  If the ALJ determines that a child claimant has an impairment(s) that is "severe," then the analysis proceeds to step-three.

At step-three and only after the ALJ has determined that the impairment or combination of the same is severe, the ALJ must determine whether the impairment(s) meets, medically equals, or functionally equals the criteria for any listing of impairments in Appendix 1, Subpart P. of Section 404.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  "An impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment, or if it functionally equals the listings."  20 C.F.R. § 416.924(d).  Therefore, if a child claimant has an impairment(s) that meets or medically equals the requirements of a listing and meets the duration requirement of 42 U.S.C. § 1382c(a)(3)(C)(i) (2004), then the ALJ will find the child disabled.  *Id*.  Additionally, if a child claimant has an impairment(s) that functionally equals the requirements of a listing and meets the duration requirement above, the

ALJ will find the child disabled.  *Id.*

The requirements for determining medical equivalence are established in 20 C.F.R. § 416.926.  An impairment is medically equivalent to a listing ". . . if it is at least equal in severity and duration to the criteria of any listed impairment."   20 C.F.R. § 416.926(a).   Medical equivalence may be determined in three ways.   First, medical equivalence may be found where a child has an impairment described in the listing, but either (a) the child does not exhibit one or more of the findings specified in the particular listing or (b) the child exhibits all the findings, but one or more is less severe as described in the listing.   20 C.F.R. § 416.926(b)(1)(i).   Second, medical equivalence may be found when the other medical findings relating to the impairment are at least of equal significance to the required criteria.   20 C.F.R. § 416.926(b)(1)(ii).   Third, medical equivalence may be found where a child has an impairment that is not described in the listing, or a combination of impairments not one of which matches an impairment listed, and a comparison of the medical findings for the child's impairment is analogous or at least of equal medical significance to one of the listed impairments.   20 C.F.R. § 416.926(b)(2)-(3).

The requirements for determining functional equivalence of a listing are established in 20 C.F.R. § 416.926a.   Stated generally, to functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area of functioning, or show "marked" limitation in two areas of functioning.   20 C.F.R. § 416.926a (a).

> By "functionally equal the listings," we mean that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. . . .   We will assess the functional limitations caused by your impairment(s); i.e., what you cannot do, have difficulty doing, need help doing, or are restricted from doing because of your impairment(s).   When we make a

> finding regarding functional equivalence, we will assess the
> interactive and cumulative effects of all of the impairments for
> which we have evidence, including any impairments you have that
> are not "severe." (See § 416.924(c).)   When we assess your
> functional limitations, we will consider al the relevant factors in §§
> 416.924a, 416.924b, and 416.929 including, but not limited to: (1)
> How well you can initiate and sustain activities, how much extra
> help you need, and the effects of structured or supportive settings
> (see § 416.924a(b)(5)); (2) How you function in school (see §
> 416.924a(b)(7)); and (3) The effects of your medications or other
> treatment (see § 416.924a(b)(9)).

20 C.F.R. § 416.926a(a).

The regulations define a "marked" limitation as one which "interferes seriously with your

ability to independently initiate, sustain, or complete activities."   20 C.F.R. § 416.926a(e)(2)(i).

"'Marked' limitation also means a limitation that is 'more than moderate' but 'less than

extreme.'"   *Id*.   Furthermore, "[i]f you are a child of any age, we will find that you have a

'marked' limitation when you have a valid score that is two standard deviations or more below

the mean, but less than three standard deviations, on a comprehensive standardized test designed

to measure your ability or functioning in that domain, and your day-to-day functioning n

domain-related activities is consistent with that score."   20 C.F.R. § 416.926a(e)(2)(iii).

The regulations define an "extreme" limitation as one which "interferes very seriously

with your ability to independently initiate, sustain, or complete activities."   20 C.F.R. §

416.926a(e)(3)(i).   "'Extreme' limitation also means a limitation that is 'more than marked.'"   *Id*.

Furthermore, "[i]f you are a child of any age . . . we will find that you have an 'extreme'

limitation when you have a valid score that is three standard deviations or more below the mean

on a comprehensive standardized test designed to measure ability or functioning in that domain,

and your day to day functioning in domain-related activities is consistent with that score."  20

C.R.R. § 416.926a(e)(3)(iii).

There are six domains of functioning the ALJ will evaluate: (1) acquiring and using

information; (2) attending and completing tasks; (3) interacting and relating with others; (4)

moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical

well-being.  20 C.F.R. § 416.926a(b)(1).  If the ALJ determines a child claimant has "marked"

limitations in two, or an "extreme" limitation in one of the above domains then the child will be

found disabled.

### B.     THE STANDARD OF REVIEW

The ALJ's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C.

405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than

merely create a suspicion of the existence of a fact, and must include such relevant evidence as a

reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d

1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and

*Richardson v. Perales*, 402 U.S. 389, 401 (1971));  *accord*, *Edwards v. Sullivan*, 937 F.2d 580,

584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district

court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and

even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

*Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356,

1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account

evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*,

*Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42. U.S.C. § 405 (g)(Sentence Four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the Commissioner and enter an order awarding disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schwieker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability.  *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not

supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant

to the disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to

develop a full and fair record of claimant's residual functional capacity); *accord Brenem v.

Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to

affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a

sentence-four remand may be appropriate to allow him to explain the basis for his decision.

*Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow

ALJ to explain his basis for determining that claimant's depression did not significantly affect

her ability to work).[7]  In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken
> before the Commissioner of Social Security, but only upon a showing
> that there is new evidence which is material and that there is good cause
> for the failure to incorporate such evidence into the record in a prior
> proceeding;

42 U.S.C. § 405 (g).  To remand under sentence six, the claimant must establish:  (1) that there is

new, non-cumulative evidence; (2) that the evidence is material —  relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and (3) there is

good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at

1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d

1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also

Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).  A sentence-

---

[7] On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (on remand ALJ required to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (on remand ALJ required to consider the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

six remand may be warranted even in the absence of an error by the Commissioner if new,

material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.[8]

## V.     ANALYSIS

> **1) Whether there existed substantial evidence for the ALJ's finding that C.C. suffers from less than marked limitations in the domains of acquiring and using information and interacting and relating to others.**

In determining whether C.C.'s severe impairments functionally equal the criteria for any

listing, the ALJ weighed and largely discredited the reports from one of C.C.'s treating

physicians, Dr. Dow.  R. 20.[9]

> With regard to . . . [the] assessment by Dr. Dow, the undersigned notes that it was offered without analysis or rationale. Furthermore, it was inconsistent with the weight of the medical evidence of record.  In particular, there was no evidence of impaired motor functioning, let alone the extreme limitations found by Dr. Dow.  Furthermore, Dr. Dow's description of the claimant's cognitive deficiency as marked was inconsistent with her low-average intellect and earning a place on the honor roll once on effective medication.  For these reasons, the opinion of Dr. Dow has not been given great weight, let alone controlling weight.

R. 21.

The ALJ may limit the weight given to a treating physician's report if it is unsupported

by objective medical evidence or is wholly conclusory.  *See Edwards v. Sullivan*, 937 F. 2d 580

(11th Cir. 1991); *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986).  The ALJ's

determination to give little weight to Dr. Dow's assessment of C.C.'s motor function is clearly

supported by the record because nowhere else are issues regarding C.C.'s motor functioning

---

[8] With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.  *Id.*

[9] Williams does not argue that C.C. has an impairment or combination of impairments that meets or medically equals the criteria for any impairments described in the listing.

reflected in the record.  *See Cash v. Apfel*, Case No. 00-0042-BH-L, 2001 WL 102339 *8 (S.D. Ala. Jan. 2, 2001) (holding that treating physician's check mark on form indicating the child suffered from marked functional limitations was wholly conclusory and inconsistent with other credible medical evidence in the record).

### Acquiring and Using Information

In the domain of acquiring and using information, the ALJ made the following conclusions:

> With regard to the child's acquiring and using information, **her valid intelligence quotient was low-average and once she was appropriately medicated, she earned a place on the honor roll at school**.  The undersigned therefore finds that any limitations of the claimant's ability to acquire and use information are less than marked.

R. 21 (emphasis added).  However, the ALJ's conclusion that C.C.'s intellectual ability was "low-average" was derived solely from C.C.'s scores on the 1997 standard IQ test administered by Dr. Siegfried, a licensed school psychologist.  R. 18.  In his brief, the Commissioner admits that the ALJ's determination was based on the 1997 standard IQ test scores.  Def.'s Br. 7.

Citing 20 C.F.R. § 112.00(D)(1), Williams argues that the ALJ's reliance on the 1997 standardized IQ test scores was improper.  Pl.'s Br. 15.[10]  Williams contends that Section 112.00(D)(10) provides that IQ test results for children under the age of seven are only good for two years.  *Id*. Because C.C. was six years old at the time of the 1997 tests and because the test results were seven years old at the time of the hearing, Williams maintains that as a matter of law the ALJ could not rely on those results for a determination that C.C. suffers from a "low-average

---

[10] IQ test results must also be sufficiently current for accurate assessment under 20 C.F.R. § 112.05.  Generally, the results of IQ tests tend to stabilize by the age of 16.  Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior.  IQ test results obtained between the ages of 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.  IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(D)(10).

intellect."  Pl.'s Br. 15.  Therefore, Williams asserts that the ALJ's ultimate conclusion that C.C.'s has a "less than marked" limitation in the domain of acquiring and using information is not supported by substantial evidence.  Pl.'s Br. 15.

The Commissioner argues that Section 112.00(D)(10) applies only to the listing for mental retardation.  Def.'s Br. 7.  According to the Commissioner, because the ALJ did not use the 1997 IQ results to determine whether C.C.'s impairments meet or medically equal listing 112.05 for mental retardation, the ALJ could properly rely on the results as evidence that C.C. did not have "marked" impairments in the domain of acquiring and using information.  Def.'s Br. 7.  Neither party provides case law support for their respective propositions.

Williams is correct.  "The use of standardized tests is the preferred method of documentation if such tests are available."  20 C.F.R. Pt. 404 Subpt. P, App. 1, § 112.00(C).  In regard to all of the listings for children's mental disorders, the regulations state the following concerning cognitive functioning:

> Cognitive/communicative function is measured using one of the several standardized . . . scales.  **Appropriate tests for the measure of such functions are discussed in 112.00D**. . . .

20 C.F.R.  Pt. 404 Subpt. P, App. 1§ 112.00(C)(1)(b) (emphasis added).  Thus, Section 112.00(D) is incorporated into Section 112.00(C)(1)(b) by reference.

In *Miller v. Barnhart*, 205 Fed.Appx. 677, 679 (10th Cir. 2006), the minor claimant was seeking SSI benefits for the impairments ADHD and oppositional/defiant disorder, the very same impairments claimed in the instant case.  *Miller*, 205 Fed.Appx. at 678.  The ALJ in *Miller* relied on only one of three IQ results in determining that the child's intelligence was low average rather borderline.  *Id*. at 679.  The Tenth Circuit held that the ALJ correctly relied on only the one IQ result because the other two tests were not taken within the relevant two year period as required

by Section 112.00(D)(10).  *Id.*  "Further, none of the [other] tests was taken within two years before the relevant period, so none is valid under the regulations.  *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 112.00D10 (2004) (stating that results of IQ tests administered between ages 7 and 16 are valid for two years when tested IQ is above 40)."  *Id.* (affirmed because the valid test score relied upon indicated that the child claimant's intelligence was "low average.").

The Eleventh Circuit has yet to rule on the appropriate application of Section 112.00(D)(10).  However, the Tenth Circuit's interpretation of Section 112.00(D)(10), rather than the one urged by the Commissioner, is the better view.  As set forth above, in regard to the use of appropriate tests, Section 112.00(D)(10) is incorporated into Section 112.00(C)(1)(b) by reference. *See supra* p. 23.   In addition, the second and third sentences of Section 112.00(D)(10) state: "Generally, the results of IQ tests tend to stabilize by the age of 16.  Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior."  *Id.*   If the Commissioner's view were correct, then that would necessarily mean that the above statements would only apply regarding individuals suffering from mental retardation and not to children generally.  There is no support for that proposition in the regulations.  The final sentences of Section 112.00(D)(10) state: "IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.  IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above."  Again, there is no support in the regulations or elsewhere for the proposition the Commissioner urges this Court to adopt; namely, that IQ tests obtained before the age of 7 are valid for more than two years if the child is not claiming to be suffering from mental retardation.  Thus, the Court finds that C.C.'s 1997 IQ results are no longer valid

and, because the ALJ relied on them in assessing C.C.'s limitations, the ALJ erred as a matter of law.[11]  This error warrants reversal.[12]

In addition to relying on an invalid IQ test score as a basis for concluding that C.C.'s functional limitations were "less than marked" in the domain of acquiring and using information, the ALJ also noted that once C.C. was properly medicated, she obtained a place on the honor roll at school.  R. 21.   The record reveals that on June 4, 2003, C.C. made the honor roll for the fifth grade, receiving all A's and B's.  R. 239.  While C.C. received all A's and B's in the areas of reading and mathematics for the year, her report card explicitly states, however, that: "Your child is making <u>UNSATISFACTORY</u> progress toward achieving state and district expectation for proficiency in READING [and] . . . MATHEMATICS."  *Id.* (emphasis in original).  C.C.'s fifth grade Florida Comprehensive Achievement Test ("FCAT") also reflect scores in 17th and 14th percentiles nationally in reading comprehension and mathematics problems solving.  R. 233.  C.C's scaled scores in reading and mathematics were also ranked in lowest level statewide.  R. 234-235.   C.C.'s sixth grade FCAT also revealed a continuing inability to make sufficient progress in reading and mathematics.  R. 252-254.  On the FCAT Norm-Reference Test, C.C. scored in just the 5th national percentile in reading comprehension and the 20th percentile in mathematics problem solving.  *Id.*   Her scaled scores in reading and mathematics continued to rank in the lowest level statewide.  *Id.* at 253.

---

[11] As mentioned earlier, the Commissioner concedes the ALJ relied on the 1997 IQ results.  Def.'s Br. 7.

[12] Additionally, when C.C. was eleven years old, Dr. Graham administered the WISC-III intelligence test again, and her scores were much lower than the 1997 IQ scores, indicating an intelligence quotient in the "mild range of mental retardation."  R. 226.  Dr. Graham opined, however, "of the strong possibility that [C.C.] is functioning in the borderline range."  R. 226.  As stated above, The ALJ gave controlling weight to the 1997 IQ results.  However, the ALJ is not permitted to "rely on any test score alone."  20 C.F.R § 416.926a(e)(4)(i).  "No single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." *Id.*  **Furthermore, the ALJ must state with particularity the weight given different medical opinions and the reasons therefore**.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

Furthermore, the record reveals that between the time C.C. made the honor roll, June of 2003, and the time she entered the sixth-grade, September of 2003, she was admitted to the "partial hospitalization program" of Halifax Medical Center due to poor anger management skills, low self esteem, and depression.  R. 246, 279, 306.  When C.C. returned to school in September of 2003, she was provided, among many other accommodations, *grading modifications*.  R. 285.[13]  On April 2, 2004, C.C.'s Individual Education Plan for the seventh grade noted her inability to work beyond a *fourth grade* level in reading, mathematics, and language arts.  R. 263.

The ALJ's opinion fails to adequately address these issues or state why the ALJ gave controlling weight to C.C.'s honor roll status in the fifth grade.  Thus, in addition to improperly relying on an invalid IQ test score, the ALJ's reliance on C.C.'s having obtained the honor roll once as a basis for determining that she suffers from "less than marked" functional limitations in the domain of acquiring and using information is not supported by substantial evidence.  Accordingly, the Court recommends that the final decision of the Commissioner be **REVERSED** and **REMANDED** for reassessment of C.C.'s functional limitations.[14]

### 2) Whether there existed substantial evidence for the ALJ to discredit the testimony of C.C.

In his decision, the ALJ failed to acknowledge that C.C. provided testimony on her own behalf.  R. 16 ("The claimant's mother, Pamela Williams, and her step-father, Felton Williams, were present to testify.").  Williams argues that the failure of the ALJ to acknowledge C.C.'s

---

[13] The record does not state whether C.C. was previously provided grading modifications.

[14] Because the Court recommends that the case be reversed and remand for further assessment in regard to C.C.'s functional limitations, it is unnecessary to address the parties' arguments concerning whether there existed substantial evidence to support the ALJ's finding that C.C. suffered from "less than marked" limitations in other domains.

testimony and to provide specific reasons for discrediting that testimony is also basis for remand.

Pl.'s Br. 22.   Williams relies Social Security Ruling 96-7, which states:

> It is not sufficient for the [ALJ] to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."   It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.   The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

*SSR 96-7P*, 1996 WL 374186 *2 (1996).   The Commissioner argues, however, that "[b]y specifically finding that William's allegations and the allegations of [C.C.'s] step-father were not fully credible, the ALJ implicitly rejected the duplicate allegations of [C.C.]."   Def.'s Br. 19. Thus, the Commissioner asserts that the ALJ did in fact consider C.C.'s testimony and reject it as not credible.   *Id.*   (". . . [T]he ALJ did not need to specifically discuss the unsupported and duplicative allegations of [C.C.]").   In support of this proposition, the Commissioner relies on *Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981) and *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).   However, *Allen* involved an adult claimant who sought disability benefits based on his inability to work due to severe pain behind his eyes which caused numerous blackouts each day.   *Allen*, 642 F.2d at 800-01.   There was no supporting medical evidence regarding Allen's pain, but he relied solely on his own and his ex-wife's subjective testimony. *Id.* at 801.   The ALJ found Allen's testimony not credible, but did not make any findings regarding whether or not he actually had blackouts or the degree of pain he experienced.   *Id.*   The Fifth Circuit held that "there was a clear, though perhaps implicit, rejection of the subjective testimony as to the disabling nature of Allen's pain."   *Id.*   In the present case, C.C. did not testify about her substantive allegations or impairments like the claimant in *Allen*.   Rather, C.C. testified

as to her behavior problems at school, her relationship with her siblings, and her desire not to have any friends.  R. 327-330.  Thus, the Court finds that *Allen* is distinguishable from the present case.

The Commissioner's reliance on *Dyer*, 395 F.3d at 1211, is also misplaced because there the ALJ did specifically consider Dyer's subjective testimony and "systematically articulated his reasons for rejecting" the testimony.  *Id*.  In the present case, there is nothing indicating that the ALJ even considered C.C.'s testimony, much less any systematic, articulated reasons for rejecting it.  The Commissioner's arguments are flawed.   Not only are the cases relied upon by the Commissioner distinguishable from the present case, "[g]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."  *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003); *Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001); *Fargnoli v. Massanari*, 247 F.3d 34, 44 n. 7 (3d Cir. 2001).  If the ALJ specifically discredits the testimony of a complainant or other witness, he or she must provide specific reasons for doing so that are supported by the evidence.  *Powell v. Astrue*, 250 Fed. Appx. 960, 964 (11th Cir. 2007).  The ALJ failed to do so in this case.  Therefore, it is recommended that the final decision of the Commissioner be **REVERSED** and **REMANDED.**   On remand, the ALJ shall specifically address C.C.'s testimony and C.C.'s credibility.[15]

## VI.   **CONCLUSION**

For the reasons stated above, it is recommended that the final decision of the Commissioner be **REVERSED AND REMANDED** for:

(1) Reassessment of C.C.'s functional limitations; and

(2) Assessment of C.C.'s testimony and credibility.

---

[15] In light of the foregoing, the Court finds it unnecessary to address the other issues raised by the parties.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RECOMMENDED** at Orlando, Florida on August 14, 2008.

_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE


The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:

The Patricia C. Fawsett
United States District Judge

Sarah H. Bohr
Bohr & Harrington, LLC
2337 Seminole Road
Atlantic Beach, FL 32233

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Nadine DeLuca Elder, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suit 20T45
Atlanta, Georgia  30303-8920

The Honorable Chester G. Senf
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Dr.
Orlando, Florida 32817-9801